May it please the court, I am Teresa Bloodman, I represent Counselor, if you could speak up a little bit more, maybe get the mic a little closer to you so we can hear you a little better. I'm here on behalf of Patricia Walker-Swinton, and we are asking this court to reverse the district court decision to grant Philander Smith College's motion for a summer judgment. Now, this case reached its climax on April 4th, 9th, 2018 in a classroom. Ms. Walker-Swinton was the professor of Composition I, and we've all taken English Composition I as a college student, as a freshman. That course is not a developmental course, it's just a regular assigned course for all freshmen to take. During the course, Ms. Swinton, on that particular date, was administering a test to her students, and a student by the name of Jalen, whom the opposing parties would like you to believe that he was a minor, he was an adult male, he was 22 years old, and he used his cellular phone during testing. Now, use of cellular phones pursuant to Philander's policy is a violation of their policy. Ms. Walker-Swinton asked Mr. Jalen if he would put his phone away, and his response was, okay, he put his phone away. Moments later, Jalen took his phone out again and started using it. Ms. Walker-Swinton asked Jalen to put his phone away again. Jalen complied. Moments later, Jalen took his cellular phone out again and began on his phone. Ms. Walker-Swinton, at that third try, walked over to Jalen and removed his test paper. At that point, Jalen became enraged. Jalen then stormed out of the classroom, using obscenities, went outside. The class continued to take their test, and at the conclusion of everyone completing their testing, Ms. Swinton addressed the class about the rules and policies of Philander and her classroom rules, which were to not use cellular telephones. Now, I will not try to make this Court believe that Ms. Swinton did not make a statement. Counsel, is there any dispute about the contents of the statement made as opposed to characterization of what was made? Well, there's a dispute that we believe should have gone as a jury question in terms of her use of the statement. The statement was made that was addressed to the class. But as to the content of the statement itself, factually, is that in dispute? The content of the statement is not in dispute. What is in dispute is whom the statement was related to. Because Philander began by saying the statement was addressed to Jalen, a disabled student. The class is not a disabled course, and Jalen is not, there is no evidence in the record that indicates that Jalen has a disability. So, we believe that that is a point of contention for the jury to determine whether she was speaking to him, or about him, or to the class. I was wondering, Counsel, what's the connection between your client's termination and her gender? I mean, that's your claim, right? Yes. What is the gender connection? I'm sorry, Your Honor. What is the gender connection between your client's termination? The gender connection is that Ms. Walker Swinton argued that in her position related to gender was that she was hired in a position, she held a position as a chair of her department. And during the time that she was chair of the department, there were two other chairs in two other departments who happened to be males. Those male employees held the same position, they had the same supervisor, all three of them, Ms. Swinton and the other two male. And Ms. Swinton was not paid for that position, whereas the other two males were paid. Well, that's your pay claim, right? I'm talking about your termination claim. The termination claim in relation to gender was that we made the argument that there were some employees, specifically the president, who made comments that were in violation of the policy. He used cursive language in the midst of an orientation, which was a classroom, and he used an expletive. He was not terminated or reprimanded. Now, Philander would argue that this is different because he is the president. Well, in terms of Philander's harassment policy, it doesn't constitute what position he's in, and I am aware that the law says comparators. Now, we take the position that smothers using cursive language to other employee males who use cursive language. We didn't report to the same person, though. They did not. That's true, Your Honor. They did not. I think some of our cases are pretty tough on comparators, proposed comparators, when the proposal of the comparators didn't report to the same supervisor. Isn't that correct? That is correct. That is correct. I mean, who would the president presumably report to the Board of Trustees, wouldn't he? Yes, Your Honor. Okay. Thank you. But one of our points on that is that the gist of the entire thing is that Philander violated their policy, and their policy that they violated was in terms of how they terminated or came to a decision to terminate Ms. Walker Swinton. They came to the process of terminating her by violating their own policy, and evidence in the record is that the policy specifically states that if there is a complaint made of harassment, which Ms. Swinton did make a complaint against a student for harassment of the April 9th incident, that incident was not investigated pursuant to Philander's policy for investigation. Philander did a couple of things. Philander did not allow human resource to address the issue, and pursuant to their policy, all complaints related to harassment go through HR. HR did not assign a committee to investigate. Who decided that? President Smothers. President Smothers asked Stevenson, VP, to charge. We guess he took charge because once Ms. Swinton made her complaint to Dr. Stevenson, Dr. Stevenson called her in for a discussion. Ms. Swinton went in for the discussion. When you say made her complaint, what complaint was she making? Ms. Swinton filed a complaint for harassment against a student, Jalen, for coming in, attempting to attack her, terroristic, threatening, abusive language, which was all a violation of Philander's policy. Once that complaint was made formally, HR was not involved in it at all. Their policy says HR is involved. HR decides and appoints a group of persons to do the investigation. It didn't happen like that. Ms. Swinton showed up pursuant to Dr. Stevenson's request to come in and discuss the incident that had occurred. She went in. When she got there, she was shocked because it was something other than a discussion between those two. Two other persons were there, Dean of Students Dakota Doman was present, and Philander's counsel was present. Philander's counsel is the individual who orchestrated or convened or asked the questioning during that session. It appeared to be a hearing of sorts. Ms. Walker Swinton was the only person who was questioned. At that point, Ms. Swinton asked Stevenson, and it's in the record, when I thought you were here to discuss my claim and his comment, we have two complaints that were made. The two complaints that we're investigating are your complaint against a student and a student's complaint against you. Ms. Walker Swinton never knew that there was a complaint made by the student about her. She didn't receive any information. Policy, Philander says that you give them notice that there's a complaint. She didn't have notice that there was even a complaint. She knew of her complaint that she had made. What ensued after that? During that session, Philander's attorney questioned her. Dakota Doman, Dean of Students, questioned her, and she answered truthfully. During that conversation also, hearing of sorts, the attorney for Philander asked Ms. Swinton, in reference to her cellular phone, some questions, and he wanted to have her cellular phone. He went over and approached her and snatched the cellular phone from her hand. There were two other witnesses standing outside the door who saw that and were just alarmed because here's a man snatching a phone. Was it a personal cell phone or a school supply phone? It was a personal cell phone. Philander did not give her an issue, a cell phone, to her. It was her personal cell phone. He, pursuant to the record, approached her, snatched it, and made contact with her. Now, that was a violation of Philander's policy because counsel from a PSC should not have even been involved in it. HR should have been involved. The record indicates the human resource officer was Newton, Chris Newton. He was not involved at all. And so our argument is that Philander's violation of their policy was egregious, shouldn't have done it, slap him on the wrist, go back, because that was out of order. Let me ask you, are you pressing your wage claim or your salary claim on appeal? There wasn't much in the brief about it. We did ask about that, but the court decided not to entertain that. I said it wasn't exhausted. Isn't that right? She did say that, and she weighed jurisdiction. Did you challenge that decision? I'm sorry, Your Honor? Did you challenge that decision? Sorry. Yes, we asked that that be reviewed because our belief is that that wage claim was inextricably intertwined with issues related to her not being paid based on gender. Can I ask a question about the policy? You mentioned that there was a policy that HR had to follow with respect to Ms. Swinton's complaint. Is that in the record? I noticed that there is a policy dealing with student complaints against faculty, but I didn't see that there was a policy in the record describing how complaints against teachers were handled. Yes, Your Honor. APP 154 starts with the forms of harassment. If you look at APP 156, it starts talking about complaint procedures and the forms of complaints. And APP 157 identifies the investigation and informal resolution of harassment complaints, what Philander is supposed to do pursuant to having received a complaint for harassment. Okay, thank you. You're welcome. We believe that by showing Philander had violated their policies, that that's evidence of pretext. And the real reason for terminating Ms. Swinton was not because she used a racial slur related to a disability. But didn't the school say it was more than the language in the moment? It also involved conduct subsequent with attempts to influence the statements made by students who witnessed the event? Yes, Your Honor. Philander did say that in their letter termination. However, the record is silent to any statements that were made by any students related to Ms. Swinton having made any inappropriate comments and having been involved with any other thing which Philander wants the court to believe that she had something to do with. Well, what I'm referring to is the statements and outreach by the appellant to the students to help them with the formation of their statements about the event. Well, Your Honor, the record is silent from Philander. Philander doesn't have any statements from any students saying that Ms. Walker Swinton participated,  First responder to the incident was Officer Gaines. And Officer Gaines made a statement that he asked Ms. Walker Swinton to collect statements from the students who witnessed the event in the classroom. She did comply and she did that. When she collected those statements, she contacted Chief Williams to give them to him. But Chief Williams didn't have time is what he communicated. Those statements are in the record. But none of those statements from any student says that Ms. Walker Swinton asked anybody to change any statements. That's just not in the record. Philander doesn't have any statements from anyone saying that Ms. Walker Swinton did anything that was not above board. More importantly, Ms. Walker Swinton communicated the incident when she made her complaint. And she was truthful about what she said and how she responded in kind to what the male student had said to her. But there are no statements where students say that Ms. Walker Swinton asked them to change any statements. Or she just asked them to be truthful and make a statement about what they witnessed on the day of the incident. Ms. Bledman, you're with us. If you have a better time, you can continue if you like or reserve. Judge Strauss, were you about to ask a question? I was. I think there are texts or maybe some computer messages in the record that seem to be a little bit more in the line of encouraging students to say certain things. Like to document past interactions between the student and Ms. Swinton. What was his name? John Doe. Jalen. Yeah, Jalen. So I think she did a little bit more than merely said just tell the truth. She sort of tried to get them to frame it around what she wanted them to say. Am I wrong about my reading of those texts? I think so, Your Honor. What Ms. Swinton was, what she attempted to do was to get the students to write and be more detailed about the incident. Because it is English composition. And she wanted her students to give the specifics and to give a complete picture of what occurred on that day in that classroom. But she didn't ask the students to rewrite any statements or to try to coerce their statements to fit her script. And there is nothing in the record by any students that Philander has or presented that said that she did otherwise. It's just not there. Do you wish to reserve the remainder of your time? I would like to reserve. Thank you. Thank you. If there are no more questions, thank you, Your Honors. Counsel for Philander-Smith, I will not embarrass myself by attempting an inappropriate pronunciation of your name. So you can tell us that and we will proceed from there. May it please the Court, thank you, Your Honors, and good morning. My name is Abtin Metazadegan. I have the privilege of representing the appellee defendant, Philander-Smith College, in this employment action. This lawsuit is a bit of a kitchen sink approach to litigation. And so to the extent that I cannot address each and every point on appeal, I will rely on our briefing. But the district court here explained in 67 pages, meticulously, why summary judgment was appropriate. That decision deserves to be affirmed. And I'd like to provide a little extra context as to why that is. That's really what this case is about, context. The first piece of context that this court should have is that Philander-Smith College is a devoutly religious institution. It's affiliated with the United Methodist Church. It has been since its founding by the Freedmen's Bureau as Walden Seminary in 1886. And today, its mission of graduating academically accomplished students engaged in social justice is a mission deeply intertwined with the teachings of the Methodist Church. The policies that we've heard about, I want to come back and correct those policies, too. Those policies all derive their core values from teachings from the Methodist Church. One of those teachings is to treat people with human dignity. Counsel, would you focus on the specifics of our case in particular? What is factually in dispute in terms of the event that the school says was the impetus for its termination? Yes, Your Honor, and I will move on. Philander-Smith College does not see any facts particularly in dispute. You've heard my colleague, Ms. Bloodman, acknowledge that the term at issue here, a disability-related slur, was uttered by this professor in addressing her class. It is true that there are fact issues related to the context of the expression and the immediate predicates before, and then the confrontations that have allegedly taken place subsequent to the classroom event. I don't believe there are any fact issues there either, Your Honor. I think there is an argument by the plaintiff appellant that the intended use of the disability-related slur was for a purpose not intended to stigmatize people with disabilities. She brought to her deposition a printout from the Urban Dictionary, for instance, that referred to the term, begins with an R, as BS or pretext or something else. But the interpretation of that term from the people who heard it, from everyone in the classroom, was that it was addressing John Doe. Where is that in the record? In the record? What the interpretation of it was by those who were present. I believe, Your Honor, that 116-8 identifies that the students were discussing. All the students understood that the professor was making that statement in reference to one particular individual. But I would take a step back and say I don't think it really matters, one way or the other, for your analysis today as to whether or not Ms. Walker Swinton intended to use the disability-related slur towards a student in particular or towards a class in general. I think, at bottom, it is still inappropriate. What we learned through the investigation is that Ms. Walker Swinton saw nothing wrong with the way she addressed her class, even though it produced this altercation in the classroom and even though it produced the altercation later on in the library of the Titus Building. In the library and then in the Titus Building. Between Ms. Walker Swinton's children and John Doe and Jane Doe, these two students, who were ultimately attacked in the classroom. Counsel, the college advanced other reasons for terminating this teacher, but there doesn't seem to be a lot of discussion about that, either in the district court's opinion or in the briefs. I mean, suppose we thought, I'm not saying we would, but suppose we thought that there was something, essentially some difficulty with the college's assertion that what she said in the classroom was really all that much of a motivating factor in their decision, but there were these other things that were happening, as well, that they claimed. For instance, that she had somehow, was somehow trying improperly to influence students to take her side in the situation. What do we do with those other reasons that have been advanced? Your Honor, I believe those are firmly established in the record. The same citation I gave you is on page 9 of our brief. It's a blocked quote. Our doc, 116-8, it's at pages 37 and 38. It states specifically, can you do another statement that points out that I was talking to the class, et cetera, et cetera. So the asking for separate statements is part and parcel in the follow-up messages saying, hey, the first ones weren't good enough. I'm sorry, I can't hear you, Counsel. The statement about requiring students to submit second statements. Yes, I understand. What I'm asking is, what do we do with those? Suppose we thought that the reason having to do with the statement in the classroom was insubstantial, so insubstantial, for instance, that it might not be a true motive. What about the existence of these other reasons? Would they be sufficient for us to affirm the case? I believe, yes, Your Honor. No one wants to talk about this particular incident, and I understand why, but there were a lot of other reasons advanced for her termination. What do we do with those? Your Honor, I think they form the decisional process that led to the termination decision. I think you consider them, and I think they're established in the record. It's not just student statements that were altered. There was a statement by Ms. Ellison, Desiree Ellison, an administrative assistant, to whom Ms. Walker-Swinton initially reported the classroom verbal altercation on April 9th. Ms. Ellison, according to Ms. Walker-Swinton's testimony, Ms. Walker-Swinton edited that statement without letting Ms. Ellison know in a way that would put her son. I'm asking you a legal question, not a fire-resistant one. Okay. I'm sorry, I'm missing a separate question. Too many facts today. I'd like to talk about the law. That's why we're here. We don't do facts. Yes, Your Honor. I'm asking you a legal question about when you have concurrent causes that you're claiming led to a result that exonerates your action. What do we do if we're not clear about whether one of those causes is legitimate? Your Honor, I think you have a bountiful precedent that establishes the question. And I think to your point, this is not really about facts. The question is whether Philander-Smith College truly believed, mistakenly or otherwise, that Ms. Walker-Swinton engaged in this activity. And there's no evidence of the record to suggest that there are factual findings. Could this be a mixed motive case? I don't believe this. A couple of good, two or three good motives and maybe not a very good one? I don't think so at all, Your Honor. A mixed motive case reduces to whether they would have done it even absent the motive that is illegitimate. No, Your Honor. I don't view this as a mixed motive case. A mixed motive case would, in part, have both a discriminatory element and a nondiscriminatory element. This is not a case in which there are discriminatory elements whatsoever in the decisional process that led to the termination. The professor used the word in her classroom. The other piece of context that I think is important here is that Philander-Smith College did have two investigations going. One from parents of John Doe and Jane Doe who threatened legal action because what they perceived was that a professor called their child the R word and then ordered a hit on that child, which was carried out by her nephew, her daughter's boyfriend, and the daughter's boyfriend's roommate. And she concealed those facts. That is, again, established in the record. I know that these are fact questions, but to the extent that they're not accurate, to the extent that Ms. Walker Swinton could, after the fact, claim underboarding quarterback and disprove the accuracy of those assertions. The fundamental fact still remains that Philander-Smith College reasonably and in good faith believed that its findings predicated on its investigation were correct and made in good faith. It went through an exhaustive investigatory process, again, following two tracks. One on a student disciplinary process and one on the employment side. On the hit point, is that a little overstated? I didn't recall any evidence. There is evidence that they're related. I mean, that's uncontested. But is there any evidence that Walker Swinton directed her family members to approach John Doe and perhaps intimidate him? The evidence of the record is that there are three episodes. The first is in the classroom around 930 in the morning. The second is after the classroom incident in the Titus Building. That's an altercation between John Doe and Walker Swinton's son. No fight occurred. No physical altercation occurred. An administrative assistant pulled John Doe and Jane Doe into a room that's separated from the hallway by a glass partition, almost the same way that those doors are behind me. Walking up the steps leading to that glass partition where John Doe and Jane Doe were on the other side, Patricia Walker Swinton was accompanied by her children, who were students of the college, her nephew, her daughter's boyfriend, and the daughter's boyfriend's roommate. She points them out, and this is firmly in the record, points them out to her compatriots. The nephew gets in front of the glass screen, makes a look at these two people, and then it subsides. The other context here is that these two students, John and Jane Doe, were transfer students. They didn't know anyone. This was their first semester on campus. They didn't know the people who attacked them. That's part of the difficulty that we had in figuring that out initially because Patricia Walker Swinton didn't tell us. She didn't tell us that AP, the daughter's boyfriend, was living with her because he had been kicked off campus at that point. She didn't tell us that her nephew was one of the people who instigated the fight, and she didn't tell us that the roommate was involved either. But the nephew went to John Doe and Jane Doe and said specifically, again, this is undisputed in the record, said specifically, what's this I hear? I'm leaving out some of the colorful language, but what's this I hear you saying to my aunt? And then the fight ensues in the cafeteria, all within a span of hours. And so one other item I'd like to point out is this discussion of policies. The record, especially the appendix 156, 157, 158, is less than clear. What I can hopefully provide is some context to say that the policies with which this court should be concerned are contained in the faculty handbook, not the student course catalog, not the student handbook, and not the non-teaching handbook for administrative staff. She was a professor, a non-tenured professor. Her conduct was ultimately governed by her contract and the faculty handbook that's attached, I believe, as Exhibit 7 to the summary judgment motion. There is nothing in those policies, in the faculty handbook policies, that calls for any type of hearing. There is a hearing contemplated by a briefing. Is that faculty handbook in the record? Yes, Your Honor. And so there is a mishmash of other policies, pages of policies taken out of context, but the faculty handbook is very clear. It does not call for this type of investigation. I'll just say, to the extent that the other policies would apply in this context. I don't know that any handbook, having written a number of them, can contemplate a situation such as this, where a professor is alleged, at least, to have called a student the R word. It's admitted here that it's in reference to the same student. The brief itself, by the way, I'd point out, makes very clear that what Patricia Walker Swinton said to her class on April 9 was a rebuke of John Doe's conduct. That is a heading in the brief, I think it's heading 2, and it's said multiple times throughout this process, or throughout the briefs. The point of that is that even if those policies were applicable here, nothing could contemplate the exigency of what the college was presented with, which was, okay, a student had an altercation with a professor. Those things happened. No one was hurt. That's a good thing, at least up to that point. And then at the end of the day, parents calling and saying a professor ordered a hit on our kids because they stood up for themselves after they were called a disability-related slur, or at least it was in reference to them. To the extent those policies have any implication here, I think unless this court is willing to reconsider its precedent around Tulwere, and every other case that suggests that federal courts are not super-personnel departments, which is what this appeal invites. It invites this court to serve as a super-personnel department, and I think the brief says this, or the appellant's briefs say this multiple times. They say the case should have been submitted to a trier of fact to determine whether a sanction less than termination was appropriate. That's not the analysis this court adopts. It's the question of whether there was a prudent case of discrimination. This court found none, and none of retaliation, and none of the other claims survived dismissal, nor were they appealed. Counsel, would you address the wage claim issue? I assume it's still going to be before us, and retaliation as well. Yes, Your Honor. As far as the wage claim, I think one of the questions, I think the easiest way to sum this up is one of the questions asked during a deposition of a plaintiff was, what are you owed? No answer. I don't know how we can have a claim that survives summary judgment when we don't even have the comparators to understand what wages were paid to them. They didn't ask for it in discovery. It's kind of an errant reference in the complaint. I think, by and large, most of those wage decisions, actually all of them, had nothing to do with her core work as a professor. That is undisputed. The $40,000 per year in the contract was undisputed. The dispute revolves around stipend payments that she did receive, and that is in the record, just perhaps not on time, stipend payments for coaching and for Is a statement of a specific damage amount an element of the claim? I think it has to be, to say one was paid more than the other. I think we must know a baseline of what the other was paid. And we don't have those facts. We don't, frankly, even have the comparators who would be involved. Certainly no one who is similarly situated. We have 45-year professors who are tenured, one of whom had a Ph.D. and they served over departments that were not general education departments. What you saw in the brief is that this professor was instrumental, truly she was, in forming this new general education division, but it didn't really exist before then. And so other departments like business and mathematics, etc., had departments, had established budgets, had the stipend payments available. This was something new. This was, in part, a group effort by professors saying we need this division of general education because some of our students are not yet prepared for college classes. English Composition I is not a collegiate, as far as we understand it, a collegiate level class, it has a remedial quality to it. It's not where we want college students to begin their coursework in English. It's to get them up to minimum standards so they can continue their education. Something you mentioned, sorry, did you want to finish that thought? No, Your Honor, I'm sorry to interrupt you. Something you mentioned reminded me, I wanted to ask, it may not be of any particular relevance, but what exactly is Professor Walker-Swinton's position in what we might call the faculty hierarchy? Is she on tenure track? No, Your Honor, she's a non-tenured term. What exactly is her position? She was a term, non-tenured, non-tenured track professor. At will, with no expectation, this is in the record, no expectation of reappointment year-to-year. The handbook does provide a separate provision for termination for cause, and that's what was decided given the extreme conduct here. But she is a term, non-tenured professor. The hierarchy is tenured, tenure track. I think within tenure it's associated. There was a contract claim here that sort of dangling at the end of the case, and I'm wondering, was that based on, is the claim that her contract required them to have cause? No, Your Honor. If it's at will, then you don't need cause, isn't that right? Correct. That's not the basis of the claim. As I understand it, the basis of the contract claim that was left open was that she should have received $5,000 for a stipend payment for coaching. Oh, that's right. Yes, thank you. And instead received $3,000. That's right. It wasn't a termination. And, again, predating April 9 or April 1, 2018. Yes, thank you for that. Judge Smith, to your question about retaliation, all of the claims about retaliation predate April 1, 2018. By and large, they relate to complaints that the professor said she made from her hiring, and they picked up in 2014, 2015, and continued throughout. We don't really know the content of those complaints, other than that they did not include claims of sexual harassment or anything else. So as far as a retaliation claim goes, the district court was correct in finding that there was no – the plaintiffs did not satisfy even a prima facie case of retaliation. I see my time is drawing to an end. Are there any other questions before I leave you? Thank you.  Thank you. Thank you, counsel. Thank you. Ms. Bledman, your rebuttal.  Opposing counsel just referenced information that the termination was also based upon Ms. Walker Swinton putting a hit on students. That's nowhere in the record. There are no statements that support she put a hit on anyone. There are no statements from anyone saying that she had anything to do with an altercation that occurred subsequent to the classroom incident. The record is just replete to that fact. We can't assume because Philander says she was involved or she had something to do with it. It's just not true because there's no evidence of that in the record. In terms of an investigation, Philander argues that there were two investigations concomitantly. Again, Ms. Walker Swinton was not aware that there was a second investigation going on that she was being investigated. She was under the impression that the complaint she made was being investigated. In terms of messages that counsel mentioned or found, he's referencing some text messages or WhatsApp messages that he contrived from Ms. Walker Swinton's phone when he accosted her during the hearing and he made contact with her and snatched her phone from her hand. He's referencing those that he didn't even have a right to. Again, those messages do not support the fact that Ms. Walker Swinton told anyone to do anything that was out of order, if you will. In mentioning the policy, the policy requires that, and it's in the record, the policy that the HR department make a finding of harassment. There was no finding made that, not even from the Boys Club, who happened to be the attorney, Stevenson and Dr. Doman. Again, Dr. Doman was not impartial because Dr. Doman was the dean of students. For the dean of students who would be investigating a complaint that a student made, and that specific student is under investigation because that's the student whom Ms. Walker Swinton made the complaint of harassment against, that's out of order. But that's what happened during that. In terms of, counsel said that parents of, I'm assuming, Jalen, that's not in the record that they made contact. There's no communication from parents in the record having been complaining about their son or daughter making any allegation. Counsel, your time has expired. I'm sorry, Your Honor. That's all right. Thank you, sirs. Thank you, Ms. Bledman. Thank you also, Mr. Mayer-Desjardins. We appreciate your presence before the court, both counsel and the arguments you've provided to us in supplementation to the briefing. We'll take the case under advisement and render a decision in due course. Thank you. Counsel may be excused.